**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Harrisonburg Division**

| | |
|---|---|
| **DARLA V. EDWARDS** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No.: 5:23-cv-74** |
| ) | |
| **JAMES MADISON UNIVERSITY,** ) | |
| ) | |
| **and** ) | |
| ) | |
| **VIRGINIA ADVANCED STUDY** ) | |
| **STRATEGIES, INC., DBA** ) | |
| **"VIRGINIA EDUCATION** ) | |
| **STRATEGIES"** ) | |
| **("VES")** ) | |
| ) | |
| **and** ) | |
| ) | |
| **JENNIFER STEVENS,** ) | |
| ) | |
| **Defendants.** ) | |

**SECOND AMENDED COMPLAINT**

**(Jury Trial Demanded)**

Plaintiff Darla V. Edwards ("Edwards"), for her Second Amended Complaint against Defendants James Madison University ("JMU"), Virginia Advanced Study Strategies, Inc. doing business as "Virginia Education Strategies" ("VES"), and Jennifer Stevens ("Stevens") (collectively "Defendants"), states as follows:

NATURE OF ACTION

1.      Darla Edwards is a powerhouse in the education sector of Virginia, and she brought years of exemplary service and experience with school divisions, the

1

Virginia Board of Education, and education leaders across the Commonwealth to her position as the Director of Business and Education Partnerships at VES, until she was unlawfully terminated after raising concerns of racial discrimination.  Edwards brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*  ("Title VII") against JMU because JMU discriminated and retaliated against Edwards and wrongfully terminated Edwards' employment in violation of Title VII. Edwards brings this action under 42 U.S.C. § 1981 against VES and Stevens, because VES and Stevens also discriminated and retaliated against Edwards and wrongfully terminated Edwards' employment in violation of 42 U.S.C. § 1981.

2.     Edwards seeks legal and equitable relief to redress the injuries done to her by Defendants; injunctive relief, equitable relief including reinstatement or front pay, back pay, benefits, compensatory damages, and reasonable attorney's fees and costs from all Defendants. In addition, Edwards seeks punitive damages from VES and Stevens.

<u>JURISDICTION AND VENUE</u>

3.     This Court has original jurisdiction over this Complaint and to adjudicate the claims stated herein under 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981, and/or 28 U.S.C. §§ 1331 and 1343.

4.     Venue is proper in the Western District of Virginia and in the Harrisonburg Division under 42 U.S.C. § 2000e-5(f) which provides that venue is proper in any district court in the state; see also *General Electric Co. v. Merhige*, 1972

2

U.S. App. LEXIS 6632, No. 72-3327, 1972 WL 2610 (4th Cir. Nov. 20, 1972) (unpublished) (applying provision). The claims presented herein arose and Defendants reside within this judicial district and division.

5.     Edwards has exhausted all necessary procedural prerequisites and has filed her Title VII claims against JMU within ninety (90) days of her receipt of a "Right to Sue" letter from the Equal Employment Opportunity Commission.

<u>PARTIES</u>

6.     Edwards is a 50-year-old Black, female resident of Hampton, Virginia who, at all times pertinent hereto, was employed by Defendants as the Director of Business and Education Partnerships since August of 2018. At all times relevant to the matters alleged herein, Edwards was an employee of JMU within the meaning of Title VII pursuant to 42 U.S.C. § 2000e(f).

7.     Defendant JMU is a public university and an arm of the Commonwealth. At all times pertinent hereto, Defendant JMU has been Edwards' "employer" within the meaning of 42 U.S.C. § 2000(b) and has been subject to the provisions of Title VII. At all times pertinent hereto, JMU employed more than 500 employees.

8.     Defendant VES is a Virginia nonstock corporation formed on July 31, 2007. At all times pertinent hereto JMU and VES were Edwards' joint employer.

9.     Defendant Jennifer Stevens ("Stevens") is and at all times pertinent hereto was President and CEO of VES. Stevens is also a faculty member of, and subjected to all employment agreements with, JMU. As Edwards' supervisor and the individual who made the decision on behalf of both VES and JMU to discriminate and

3

retaliate against Edwards and fire her, Stevens is individually liable under 42 U.S.C. § 1981. Stevens is a white female.

FACTS

10.    Darla Edwards holds a Bachelor's degree in Early Childhood Education, a Master's degree in Educational Leadership, and an Educational Specialist degree in Education Administration/Leadership. She is currently working on a doctoral degree in Educational Policy, Programming, and Planning at the College of William & Mary.

11.    Edwards has more than twenty years of experience in the field of education in the Commonwealth of Virginia. Her career has been marked with significant accomplishments, and she has held a number of leadership positions. Her experiences range across the sector; she has been: an educator, administrator, held advisory positions, and now serves on a variety of boards and supports school districts around the nation on strategic family educational engagement initiatives.

12.    For nine (9) years from 2000-2009, she served as the Principal of Madison Heights Elementary School, the largest elementary school in Amherst County, Virginia, where she led more than 90 faculty and staff. In 2008, the Virginia Association of Elementary School Principals honored her with the prestigious School Bell Leadership Award, which recognized excellence in elementary school leadership. Prior to that, from 1998-2000, she served as an Assistant Principal at Bedford Hills Elementary School, in Lynchburg, Virginia, where she assisted with the daily operations and leadership of over 70 professional and classified staff. In that position,

she was also a School Technology Specialist, responsible for the effective integration, maintenance, and support of technology in the educational environment. This role involved working closely with teachers, staff, and students to ensure that technology resources were utilized efficiently to enhance teaching and learning. She began her career in education in 1995, as an Early Childhood teacher and Title I teacher. She served in those capacities from 1995-1998.

13.    In line with Edwards' dedication and service to education in Virginia, in 2006 Edwards co-founded Successful Innovations, an organization supporting schools, primarily in early education, in providing families with interactive resources to support their child's learning by engaging families in their child's education. Successful Innovations hosts conferences around the nation that are focused on family engagement, and has worked successfully with Head Start centers, early childhood, and Title I schools throughout the Commonwealth of Virginia and the nation.

14.    In recognition and endorsement of Edwards' accomplishments in and contributions to the field of education, in 2012, the Governor of Virginia appointed Edwards to serve on the Virginia Board of Education, where she served from 2012 until 2016 providing leadership for Virginia's education system.

15.    In 2016, Veronica Tate ("Tate"), then the Chief Executive Officer ("CEO") of VES, recruited Edwards to assist VES with the making of a video to support the organization with fulfilling the outreach requirements dictated by a grant that VES was working with at the time. Tate was aware of Edwards' ownership of

Successful Innovations when recruiting her to assist with the video which provided effective strategies to support schools with leading effective math workshops for families. This supported VES by fulfilling the outreach requirements dictated by the Rural Math Innovation grant for which VES was grant recipient.

16.     In 2018, after Edwards' success on the video project for VES and Tate's knowledge of Edwards' significant contributions to Virginia's educational system, Tate recruited Edwards to work for Defendant VES because of and to utilize Edwards' impressive background, connections, and extensive experience in the education sector.

17.     Defendants jointly employed Edwards in or about August of 2018. Defendant VES employed Edwards as Director of Business and Education Partnerships. JMU employed Edwards as a faculty member to work at VES.

18.     Defendants entered into an Employment Agreement with Edwards that automatically renewed each summer. Exhibit 1. On JMU's behalf, the Employment Agreement with Edwards was signed by Carol Fleming, a faculty member in the Department of Professional & Continuing Education ("P&CE"), and that department's Dean. Exhibit 1 at p. 2. JMU initially employed Edwards as a faculty member in P&CE, and later as a faculty member in its College of Education working at VES.

19.     Edwards at all times during her employment with Defendants was a JMU faculty member, and was paid by JMU as a staff member of VES.

20.     The Employment Agreement was a one-year employment contract with Defendants, automatically renewing each year, and contingent on funding. During her employment with JMU and VES, funding was never a problem. With extensive support and effort from Edwards, Defendants applied for and successfully secured a U.S. Department of Education grant of almost Eleven Million Dollars ($11,000,000) for VES at the end of December of 2020. Funding for VES was thus secured through the end of 2025 and was never an issue for Edwards' continued employment.

21.     Because of her exemplary performance, Defendants renewed Edwards' contract in August of 2019, August of 2020, August of 2021, and August of 2022. Throughout her employment, Edwards was a full-time, benefits eligible employee.

22.     At all times relevant to the matters alleged herein, Edwards performed her work at the direction of Defendants as an employee.

23.     In 2018, with Tate as the CEO of VES, Defendant Stevens was Vice President ("VP") when Edwards was hired. Upon information and belief, Tate is Hispanic.

24.     In mid-2018, Amanda Adams ("Adams") applied for the position for which Edwards was hired. Adams was rejected for the position and Edwards was hired because Edwards was more qualified.

25.     In or around November 2018, VES hired Adams as Outreach & Development Coordinator. Like Edwards and Stevens, Adams signed an employment agreement with JMU.

26.     Adams is white as are all other VES employees except Edwards. Upon information and belief, Adams was about 30 years old when she began working at VES. She has a Bachelor's degree in Sociology and a Master's degree in Public Policy.

27.     The differences in the qualifications between Edwards and Adams were striking.  Unlike Edwards, Adams had no leadership experience in an educational setting, none of her degrees are in leadership, and she had not held any leadership positions that required her to oversee and evaluate educational staff.

28.     Upon information and belief, Adams' work background primarily included website development, social media, and working with online platforms. Her work with VES as the Outreach & Development Coordinator primarily included functions unrelated to operations or client/external facing work, but dealing with technology—such as managing the Canvas software platform, handling the professional learning dashboard, creating social media posts, and making TikTok videos. Her outreach responsibilities were limited mostly to public relations on the VES website and social networks.

29.     Edwards' job duties as the Director of Business and Education Partnerships were myriad and demanding. She built partnerships with education stakeholders around the Commonwealth, maintained and leveraged existing connections she brought to the table from her prior experience including with Successful Innovations, and performed a number of executive functions in the grant world. Specifically, she developed successful grant applications, secured revenue-generating contracts for VES, facilitated a cohort of administrators on grant-related

items, recruited leaders to participate in grant projects, organized expert-led webinars to support business and educational leaders, and forged national partnerships with VES to promote and raise awareness of VES as an entity among state and national leaders. Edwards also attended meetings at JMU with VES and JMU's Dean and Assistant Dean of Education, as well as the Project Manager from JMU who was assigned to grants to discuss project updates, timelines, and deliverables.

30.     Even before Defendants hired Edwards, VES was aware of Successful Innovations. Tate was very familiar with Successful Innovations and Edwards' involvement with that organization.

31.     In August of 2018, after conducting a due diligence review of Successful Innovations, Tate personally informed the Board of Directors of VES that there was no conflict of interest between Edwards' business activities at Successful Innovations and her employment at VES.

32.     There was no conflict of interest. Among other reasons, VES and Successful Innovations have always targeted different sectors of education. VES has always focused on high schools, college and career preparation, and work-based learning opportunities; while Successful Innovations' focus was and continues to be on family engagement resources and services to support early childhood centers and Title I schools.

33.     In November of 2018, Tate resigned as CEO of VES to pursue other career opportunities, leaving a known vacancy of that position. At that time, Tate

encouraged Edwards to apply for the position of CEO because of her outstanding leadership qualifications.

34.     Stevens became the new CEO of VES in late 2018. Edwards remained in her position as Director of Business and Education Partnerships, and the team carried on its work, and no concern or mention of Edwards' involvement with Successful Innovations arose.

35.     The Vice President position was left vacant.

36.     In early June 2020, Stevens requested that Edwards prepare and present a talk on potential business and partnership opportunities for VES. Edwards did as requested and had a presentation prepared for a meeting on June 3, 2020. However, when Edwards joined the meeting, she was stunned when she was confronted by Stevens and Adams, with Sandy Wilborn (another colleague) on the meeting, about Edwards' involvement with Successful Innovations. Stevens and Adams peppered her with questions about the organization, and Edwards realized that she was being interrogated. Edwards expressed that she felt like she was being harassed, and that if Stevens had concerns about Successful Innovations, the appropriate way to address those concerns would have been to consult with Edwards privately and not in front of Edwards' co-workers who were encouraged to join in on the questioning.

37.     The next day, June 4, 2020, Edwards and Stevens continued the discussion about what had transpired the previous day. Edwards described how she felt attacked, embarrassed, and humiliated by the questioning because it "came out

of nowhere," since Edwards had been told the June 3 meeting would be about one topic for which she had prepared a presentation, but the meeting turned out to be an interrogation about Successful Innovations. Edwards expressed that she felt "like [she] was publically (sic) lynched when everyone was shooting questions at [her]."

38.     Stevens stated "I don't think anyone ever expected you to give up ownership of your company that you worked so hard to build, and I certainly don't expect that now." Stevens continued, "But there is so much we don't know about the company, how it operates, who actually does take care of the day to day operations, etc. So I think having you provide us with more of that would be very helpful. Does SI have an annual report?"

39.     Edwards responded that her company "was never involved in anything that would be in competition to Virginia Ed Strategies," and assured Stevens, "[P]lease never question my loyalty. I am all in."

40.     Edwards continued to express feelings of racial exclusion and being singled out for her involvement in Successful Innovations, as well as in other conduct to which she had been subjected, including "[s]ecret meetings and phone calls that [Edwards] was not privy to[,]" like [the organization] didn't want a negro to be involved[.]"

41.     Stevens admitted that she could not understand what it was like to be the only minority on an all-white team, but she attempted to minimize the conduct to which she had subjected Edwards, contending that she did not feel that the team had ever treated Edwards in a way as to devalue her. Stevens ignored that she had

just instructed Edwards to prepare a presentation for June 3 on a different topic and then discarded that topic as soon as the meeting started, before subjecting Edwards to hyperscrutiny over Successful Innovations in front of colleagues.

42.   Despite the harassment Edwards experienced, Edwards' responses to Stevens' inquiries about Successful Innovations were satisfactory to Defendants.

43.   There were no further complaints or concerns about any conflict between VES and Successful Innovations, Inc. until over two years later, in May of 2022, after VES had implemented a Conflict of Interest Policy ("COI Policy"), when Edwards once again provided information about Successful Innovations. The outcome was the same as the previous two times when Edwards had provided information about Successful Innovations: there was no conflict.

44.   In 2021, Defendant VES "rebranded", changing its name from Virginia Advanced Study Strategies to Virginia Education Strategies. Along with that process, job titles changed. Edwards' new title became: Director of Business and Education Partnerships. Adams' new title was Director of Innovation/Technology.

45.   The changes in title did not correspond with changes in the duties performed in each position. Edwards continued assisting major grant endeavors, building and maintaining relationships across the Commonwealth for the benefit of Defendants, and overseeing grant-related tasks. Adams' work continued to support website, social media, and other technical assistance relating to the professional learning dashboard.

46.     During her employment by Defendants after Tate left VES, Edwards was subjected to differences in treatment, to her disadvantage, in the terms, privileges, and conditions of employment. VES hyper-scrutinized Edwards' relationship with Successful Innovations and it excluded her from meetings and calls with her colleagues.

47.     Defendants also treated Edwards differently in the application of its purported policies.  Defendants, through Stevens, entered into business transactions with family members of Stevens and Adams to perform work for Defendants and receive compensation from grants. Stevens' son, Jared Stevens, provided technological support in the summer of 2021, although he was just recently out of college and had been unemployed for months. Mickey Orrell, Adams' husband, also worked to provide technological support between 2021 and 2022.  Defendants also entered into a  business transaction with the husband of another of Defendant's employees for similar work in an area for which Adams was responsible.

48.     In late 2021, Stevens assigned Adams to oversee and perform the work for a very promising and large project with JMU for VES to become a program evaluator for the Virginia New Teacher Support Grant. This opportunity would have allowed VES to expand its capabilities and enhance its funding sources, but Adams fumbled the project and alienated the JMU professor who had presented VES the opportunity. As a result, JMU demanded VES stop all work it was doing on the project and return all data it had given VES to evaluate.

49.     Stevens' response to Adams' failure focused on ensuring that Adams' feelings were not hurt, rather than assessing Adams' shortfalls and areas for improvement to ensure future similar incompetencies did not cost the organization additional major funding opportunities in the future.

50.     Another favor that Stevens granted Adams to the exclusion of Edwards was that Adams refused to work on Saturdays, even though a project involving technology — Adams' primary area of responsibility — required conducting training sessions utilizing technological platforms and software on Saturdays. Stevens assigned Adams' weekend duties to Edwards who conducted the training sessions in addition to her numerous other duties. Edwards covered these Saturday meetings for Adams until the completion of the contract requiring the trainings.

51.     Stevens also permitted Adams to attend certain VES functions virtually that Edwards had to attend in-person.

52.     Without warning, notice, or prior discussion with Edwards, at an organization retreat on October 6, 2022, at which all VES staff with the exception of Sandy Wilborn and Alicia Belcher (who were absent), were in attendance, Stevens announced that she was promoting Adams to Vice President of VES. A celebration ensued, including Adams' mother who participated by Facetime, and Adams' husband who was in attendance at the retreat. Stevens forecast that she would discuss with the team the impact of the promotion at their next retreat in January of 2023.

14

53.   Other VES employees, including Sandy Wilborn, together with Adams' mother and husband, had been apprised of the promotion of Adams to Vice President. Edwards was not advised of this decision.

54.   Indeed, the announcement of Adams' promotion came as a complete shock to Edwards, as it was the first she was hearing about any anticipated organizational changes at VES; and because Adams' background and performance to that point demonstrated nothing to support a promotion to a Vice President position. Furthermore, Edwards would have been the employee who should have been given such a role, and she would have applied and accepted the position had she known that the position was available.

55.   Edwards' teammates evidenced a lack of surprise for Adams' promotion to the VP position, indicating prior knowledge of the decision, as did the inclusion in the celebration of Adams' mother who had been conferenced in on Facetime to watch as Stevens made the announcement.

56.   Stevens had made the decision to promote Adams to the VP position prior to the October retreat and had shared this information with the rest of the VES staff and others—but not Edwards.

57.   Edwards excused herself from the celebration her teammates were having at the announcement of Adams' promotion, and she retreated to the kitchen in the house where the retreat was being held.

58.   When Stevens entered the kitchen and approached the refrigerator, Edwards confronted her. Edwards was highly upset by what she had just learned,

and told Stevens "this is discrimination and you know it," that Adams had only been promoted to VP because Adams "was white," and that Stevens was "wrong for that."

59.    Edwards complained to Stevens because she had not been considered or even allowed to apply for the position of Vice President even though she was far more experienced, far more qualified and more senior than Adams, and had evidenced exemplary performance compared to Adams; and Stevens had not even shared with the organization that she was considering filling the VP position, much less giving Edwards a competitive opportunity to obtain the position.

60.    Stevens, who was within a few feet of Edwards when Edwards made the complaint, stared at Edwards but gave no response. She did not explain her reasons for selecting Adams over Edwards, she did not deny or counter Edwards' protest that Adams' appointment was discrimination because Adams "was white," and she offered no assurances that Adams' promotion was based on non-discriminatory business reasons. Instead, Stevens said nothing. Making no effort to counter Edwards' protest of race discrimination, and ignoring the obvious fact that Edwards was highly upset by the discrimination, Stevens simply stared at Edwards, looked away, started fiddling with her cell phone, and then left the kitchen and joined the others.

61.    After Stevens left the kitchen to return to the celebration of Adams' promotion, Edwards, feeling too uncomfortable to remain, moved to a separate hotel that evening before joining the group again for the remainder of the retreat the next day. After the October 2022 retreat, Edwards continued performing her job well. This included serving as the Facilitator for the CHOICE grant. Stevens did not share any

plans for new structures or implementation of Adams as VP over the next two months.

62.     At the next VES retreat held on January 12, 2023, at the Virginian Hotel in Lynchburg, Virginia, Stevens unveiled the first implementation plans for Adams' promotion.

63.     Showing a Powerpoint presentation which was not circulated, and for the first time, Stevens presented a new organization chart that showed Adams as the new supervisor for Edwards and other VES employees. According to the chart, Edwards was the only VES employee at a Director level who was not assigned supervisory status over any staff. She also was the only Director who did not report directly to Stevens. Rather, Edwards was now relegated to work under Adams.

64.     Edwards, who had been shocked at Adams' secret "shoulder-tap" promotion to VP without posting the position for a competitive application, and more importantly, Adams' lack of leadership and supervisory experience, was even more devastated to see that the implementation of Adam's VP role was to include supervising Edwards — who had decades more of experience in education-specific leadership and supervisory roles in her background.

65.     Devastated, Edwards remained in the room to confront Stevens about the Adams promotion. Edwards once again told Stevens that the decision to elevate Adams was racially motivated, and Edwards told Stevens that she gave Adams the job "because she is white." Edwards stated again that "this is discrimination," and

added that she was more qualified, and that she was going to complain to "the Board, JMU, and OCR (the Office of Civil Rights)".

66.    Indeed, there was a Board of Directors meeting scheduled for mid-January, then just days away.

67.    In the past, Edwards had routinely participated in Board of Directors meetings.

68.    Stevens had previously told staff at a meeting that they did not need to attend the Board meeting but that anybody who wanted to attend could do so.

69.    When Edwards tried to join the meeting via Zoom, however, she found that Stevens had locked her out of the meeting.

70.    Two weeks later, on January 30, 2023, Stevens asked Edwards to join her for a Zoom meeting to discuss a project VES was working on. When Edwards joined the meeting by Zoom, Adams was in the meeting as well. Stevens and Adams then summarily announced that Edwards' ownership of Successful Innovations constituted an insurmountable conflict of interest. They went on to request that Edwards either resign immediately or announce by 1 pm the next day that she would sell Successful Innovations.

71.    This allegation of a conflict of interest was false and an obvious pretext: at least three times in the previous four years, Defendants had looked at Successful Innovations and found that there was no conflict. The issue had not surfaced since May 2022 when Stevens had personally inquired about the matter, and it again was

resolved to Defendants' satisfaction. The conflict issue only resurfaced after Edwards threatened to complain about racial discrimination to the Board, JMU and the OCR.

72.     VES and JMU had been fully informed about Edwards' business since they hired her in August of 2018.

73.     Defendants' new demand that Edwards resign or sell her business was retaliatory and unlawful. It further treated Edwards differently from white employees, including Stevens, Adams, and other employees, all of whom engaged in obvious conflicts of interest, including in engaging in business transactions with their family members.

74.     On January 30, 2023, Edwards submitted an online complaint of race discrimination and retaliation to JMU's Office of Equal Opportunity ("OEO Office"). Kim Moubray of the OEO Office confirmed receipt of the complaint and promised to complete an initial evaluation within ten business days, and that Arthur Dean, the director, would provide written notification of the initial evaluation determination on or before February 13, 2023.

75.     On February 2, 2023, falsely claiming an "irreconcilable actual and/or potential conflict of interest," Defendants placed Edwards on paid administrative leave.

76.     Pursuant to JMU's Policy 1324, titled "Discrimination and Retaliation Complaint Procedure (Other than Title IX Sexual Harassment (Policy 1346) and Sexual Misconduct (Policy 1340)," "The OEO will provide written notification of the initial evaluation determination to: the complainant." Policy 1324 paragraph

6.3.b.2.i. This notification to the complainant is mandatory and due "within ten business days." *Id.* at paragraph 6.3.b.

77.    The Employment Agreement between JMU and Edwards expressly includes "the provisions of the James Madison University policies and procedures." Exhibit 1 at § 4.2.

78.    Under JMU's policies, Stevens had a duty to report Edwards' three complaints of race discrimination in June of 2020, October of 2022, and January of 2023. Instead of reporting these instances she buried them.

79.    Instead of investigating Edwards' January 30, 2023, complaint of race discrimination and retaliation, Defendants terminated Edwards on February 10, 2023, relying on a false assertion of a conflict of interest.

80.    Prior to her termination, Edwards had performed the only work in VES that was revenue-generating, in addition to her grant-related job responsibilities, and she was otherwise an exemplary employee.

81.    JMU denies that it has a job description for the VES VP position. Only recently, in 2024, have Defendants described what they purport to be the job responsibilities of the VP position, in an update to Adams' biographical information on VES' website. These responsibilities include providing "general oversight for all operations and technology integrations," and "driving the organization's ability to innovate and adapt in a rapidly changing environment."

82.    Edwards' extensive background and qualifications in leadership, oversight of VES operations, revenue-generating projects, the education grant world,

and service in the field of education in the Commonwealth unquestionably qualified and qualify her to satisfy the purported responsibilities of the VP position as represented on the VES website.

83.   Since February 10, 2023, VES has not had an employee of color. All of VES' employees are white women.

84.   Defendants did not notify Edwards of their initial evaluation of her complaint, in violation of their own policies.

85.   In its position statement to the EEOC written on August 14, 2023, JMU repeated Defendants' blatantly pretextual allegations, again falsely claiming, "On January 30, 2023, VES notified Edwards of an identified 'severe conflict of interest' and required that she present a plan 'to remedy the conflict' if she wished to remain in [the] position with Virginia Ed Strategies." Edwards engaged in no conflict, but Stevens, Adams, and at least one other employee had by engaging in business transactions with their family members.

86.   JMU knew that its narrative was false and pretextual to cover up Defendants' discriminatory and retaliatory treatment of Edwards.

87.   Defendants' decisions to discriminate and retaliate against Plaintiff, to ignore her complaints of race discrimination and to terminate her employment, were made in willful, blatant and intentional disregard of and in violation of Plaintiff's rights under Title VII and Section 1981.

88.   Defendants' employees have at all times relevant hereto acted within the scope and during the course of their employment by JMU and VES in

discriminating and retaliating against Edwards, and denying her the terms, conditions, and privileges of her employment with each Defendant.

**COUNT I**
**TITLE VII – RACE DISCRIMINATION IN PROMOTION DECISION**
**(against JMU only)**

89.     Each of the preceding paragraphs is incorporated herein by reference.

90.     Edwards, because of her race, was denied terms and conditions of employment in violation of Title VII of the Civil Rights Act of 1964, as amended.

91.     JMU, by and through its agents and employees, discriminated against Edwards on account of her race and color in a manner that substantially and adversely affected the terms, privileges, and conditions of her employment. Among other things, JMU treated Edwards less favorably than Amanda Adams, a white employee far less qualified than Edwards, when it promoted Adams to Vice President instead of Edwards, and without even informing Edwards that it was looking to fill the VP position, in violation of Title VII of the Civil Rights Act of 1964, as amended.

92.     JMU's discrimination against Edwards was an intentional or reckless disregard of Edwards' rights under Title VII of the Civil Rights Act of 1991, 42 U.S.C § 2000-e *et seq*, as amended.

93.     JMU engaged in discriminatory actions described above with malice, or with a reckless indifference to Edwards' legal rights.

94.     Edwards has been damaged as a result of JMU's unlawful conduct. As a direct and proximate result of JMU's conduct, Plaintiff has suffered great humiliation, distress, embarrassment, inconvenience, mental anguish, pain,

suffering, injury and damages, including damage to her reputation and good will, loss of income, litigation expense including attorney's fees, and consequential damages and other injury.

## COUNT II
## DISCRIMINATION AND RETALIATORY DISCHARGE ON THE BASIS OF RACE AND COLOR
## IN VIOLATION OF TITLE VII
### (against JMU only)

95.     Each of the preceding paragraphs is incorporated herein by reference.

96.     JMU, by and through its agents and employees, discriminated against Edwards on account of her race and color in a manner that substantially and adversely affected the terms, privileges, and conditions of her employment. Among other things, JMU discriminated against Edwards by treating her differently from white employees in application of policies, and it retaliated against Edwards on February 2, 2023, when it placed Edwards on paid administrative leave, in violation of Title VII of the Civil Rights Act of 1964, because she spoke up about her disparate treatment and harassment as well as the effect the discrimination was having on her.

97.     On February 10, 2023, JMU, through its employee and/or agent Stevens, terminated Edwards because she had complained to her supervisor Stevens about the fact that Stevens had promoted Adams instead of Edwards because Adams was white and that was discrimination, including because Edwards was far more experienced and skilled and qualified for the position of Vice President than Adams. JMU also retaliated against Edwards because Edwards further made it clear that she was going to elevate her complaint to the Board, to JMU, and to the OCR.

98.     JMU, through its employee and/or agent Stevens, engaged in retaliatory practices with malice and reckless indifference to the federally protected rights of Edwards. Edwards has been damaged as a result of JMU's unlawful conduct. As a direct and proximate result of JMU's conduct, Plaintiff has suffered great humiliation, distress, embarrassment, inconvenience, mental anguish, pain, suffering, injury and damages, including damage to her reputation and good will, together with  loss of employment, loss of compensation and employment related benefits, loss of health insurance, and litigation expense including attorney's fees.

**COUNT III**
**42 U.S.C. § 1981 – RACE DISCRIMINATION IN PROMOTION DECISION**
**(against VES and Stevens)**

99.     Each of the preceding paragraphs is incorporated herein by reference.

100.     VES and Stevens, by and through their agents and employees, discriminated against Edwards on account of her race and color in a manner that substantially and adversely affected the terms and conditions of her employment. Among other things, VES and Stevens treated Edwards less favorably than Adams during her employment and promoted Adams instead of Edwards, based upon her race and color, in violation of 42 U.S.C. § 1981.

101.     Edwards has been damaged by VES and Stevens' actions, including, but not limited to loss of promotion opportunities, loss of compensation and employment related benefits, and litigation expense including attorney's fees.

102.    VES and Stevens engaged in discriminatory practices with malice and reckless indifference to the federally protected rights of Edwards, thus entitling Edwards to punitive damages.

**COUNT IV**
**42 U.S.C. § 1981 – RETALIATION**
**(against VES and Stevens)**

103.    Each of the preceding paragraphs is incorporated herein by reference.

104.    VES and Stevens discriminated against Edwards on account of her race and color in a manner that substantially and adversely affected the terms and conditions of her employment. Among other things, VES and Stevens retaliated against Edwards, in violation of 42 U.S.C. § 1981, because she spoke up about her disparate treatment and harassment based on race.

105.    On February 2, 2023, VES and Stevens retaliated against Edwards on February 2, 2023, when they placed Edwards on paid administrative leave, in violation of 42 U.S.C. § 1981, because she had objected to her disparate treatment.

106.    On February 10, 2023, VES and Stevens terminated Edwards after she complained to her supervisor Stevens and JMU about the fact that VES and Stevens had promoted Adams instead of Edwards based on race, even though Edwards was far more experienced and skilled and qualified for the position of Vice President than Adams.

107.    VES and Stevens engaged in retaliatory practices with malice and reckless indifference to the federally protected rights of Edwards. Edwards has been damaged as a result of VES and Stevens unlawful conduct. As a direct and proximate

result of VES and Stevens conduct, Edwards has suffered great humiliation, distress, embarrassment, inconvenience, mental anguish, pain, suffering, injury and damages, including damage to her reputation and good will, together with loss of employment, loss of compensation and employment related benefits, loss of health insurance, and litigation expense including attorney's fees.

108.   VES and Stevens engaged in retaliatory practices with malice and reckless indifference to the federally protected rights of Edwards, thus entitling Edwards to punitive damages.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Darla V. Edwards, requests judgment against Defendants as follows:

A.   For appropriate declaratory relief regarding the unlawful acts and practices of each Defendant, pursuant to Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981;

B.   For an award of compensatory damages against each Defendant;

C.   For pre-judgment and post judgment interest;

D.   For an award of back pay and benefits for violations of Title VII and 42 U.S.C. § 1981 against each Defendant;

E.   For an award of punitive damages against VES and Stevens;

F.   For appropriate equitable or injunctive relief, including reinstatement and advancement to the position she would have occupied in absence of Defendants' illegal discriminatory and/or retaliatory conduct, or in the alternative, in the event

that reinstatement or advancement are not practical, for an award of front pay and benefits;

G.     For an award of an amount sufficient to offset any adverse tax consequences resulting from a lump sum aware or an aware of other relief in this action because she was required to file suit to enforce her federally protected rights;

H.     For an award of incidental and consequential damages, reasonable attorney's fees and costs of this action, including expert witness fees; and

I.     For such other and further relief to which Plaintiff may show herself justly entitled.

**TRIAL BY JURY IS REQUESTED**

                              **DARLA V. EDWARDS**


                              _____*/s/ Tim Schulte*_____
                              Tim Schulte (VSB # 41881)
                              Shelley Cupp Schulte, P.C.
                              3 West Cary Street
                              Richmond, Virginia 23220
                              (804) 644-9700
                              (804) 278-9634 [fax]
                              schulte@scs-work.com


                              Timothy E. Cupp (VSB# 23017)
                              Nicole D. Faut (VSB #95373)
                              Shelley Cupp Schulte, P.C.
                              1951-D Evelyn Byrd Avenue
                              Harrisonburg, VA 22801
                              (540)432-9988 Telephone
                              (804)278-9634 Facsimile
                              cupp@scs-work.com

                              *Counsel for Plaintiff*

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 20th day of June 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

Ronald N. Regnery, Esquire
Richard Shayegan, Esquire
Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
GPhillips@oag.state.va.us
RRegnery3@oag.state.va.us

*Counsel for James Madison University*

Heidi E. Siegmund (VSB # 89569)
Carl A. Retzloff (VSB # 97722)
McGuire Woods LLP
Gateway Plaza
800 East Canal Street
Richmond VA 23219-3916
hsiegmund@mcguirewoods.com
cretzloff@mcguirewoods.com

*Counsel for Defendants VES and Jennifer Stevens*

_____*/s/ Tim Schulte*_____
Tim Schulte (VSB #41881)